NO. HER D OF 1 AS

**FILED**

MAY 2 7 2011

CLERK, U.S. DISTRICT COURT

Deputy

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JOHN DAVID BATTAGLIA,<br>Petitioner, | §<br>§<br>§ | |
| v. | §<br>§ | Cause No. 3-09-CV-1904-B-BD<br>(Texas Death Penalty Case) |
| RICK THALER, Director<br>Correctional Institution Division,<br>Texas Department Criminal Justice,<br>Respondent. | §<br>§<br>§<br>§ | |

## PRO SE SUPPLEMENTAL APPLICATION FOR
## WRIT OF HABEAS CORPUS

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

COMES NOW, John David Battaglia, currently confined on death row in the Texas Department of Criminal Justice (TDCJ), Institutional Division, and petitions this Honorable Court, pursuant to 28 U.S.C sec. 2254, et seq., to issue a writ of habeas corpus ordering the petitioner's release from confinement on the grounds that the petitioner is being denied his liberty as a result of an illegal and unconstitutional judgment of conviction of capital murder and sentence of death.

### PROCEDURAL HISTORY

John David Battaglia (hereinafter "petitioner") was convicted of the offense of capital murder and sentenced to death by a jury in Cause No. F01-52159-H, in the Criminal District Court of Dallas County, Texas. The Texas Court of Criminal Appeals (CCA) affirmed the conviction and death sentence on direct appeal. See Battaglia v. State, No. AP-74,348 (Tex.Crim.App. May 18, 2005). On August 6, 2008, the trial court made Findings of Fact and Conclusions of Law recommending the denial of habeas relief. II WR494-534. Thereafter, the CCA adopted the trial court's findings of fact and conclusions of law and denied relief. Ex Parte John David Battaglia,WR71-939-01 (September 23, 2009)(per curiam). On September 22, 2010 petitioner, through appointed counsel, filed a BRIEF FOR PETITIONER for WRIT of Habeas Corpus in this Court. On January 18, 2011, petitioner filed a pro se Motion for Self-Representation (doc.38). On February 3,

2011, Magistrate Judge Jeff Kaplan issued an Order granting
petitioner's Motion in part (doc.44). The Order allowed petitioner
to submit a supplemental application for writ of habeas corpus and
raise any grounds for relief not covered in the original applica-
tion. On February 25, 2011, Magistrate Judge Jeff Kaplan issued an
Order granting petitioner's Motion for Extention of Time (doc.50)
to file a pro se supplemental writ by MAY 16, 2011 (doc.51).

## STATEMENT OF FACTS

Petitioner will ask the Court to refer back to the original
BRIEF FOR PETITIONER application filed on September 22, 2010 for
the Statement of Facts, per Fed.R.Civ.P.,Rule 15, Amended and
Supplemental Pleadings, Rule 15(c)(1) and Rule 15(d), and
incorporate the original filing with this pro se supplemental
application for writ of habeas corpus.

## STATEMENT REGARDING EXHAUSTION OF STATE REMEDIES

Petitioner has exhausted the claims in his original federal
habeas corpus application filed on September 22, 2010. Petitioner's
CLAIMS presented in this pro se supplemental application for writ
of habeas corpus have not been exhausted in state court, and
petitioner will request leave to file a Motion to Stay and Abate
the federal writ to allow the petitioner to file a subsequent writ
in state court to exhaust any unexhausted claims. With the Court's
permission, the petitioner will then exhaust any such claims and
then renew the petition in this Court. See Rhine v Weber,125 S.Ct.
1528 (2005).

## SUPPLEMENTAL CLAIMS FOR RELIEF

Petitioner will present his pro se claims as "CLAIM #9",
"CLAIM #10" and "CLAIM #11" to follow after the eight claims (or
issues) presented in the original BRIEF FOR PETITIONER application
for writ of habeas corpus filed on September 22, 2010, so as to
not confuse the Court with two dissimilar numbering schemes. The
Supplemental Claims For Relief are as follows:

CLAIM #9

PETITIONER WAS DEPRIVED OF RIGHTS TO A SPEEDY AND PUBLIC TRIAL,

AND AN IMPARTIAL JURY AND TO DUE PROCESS OF LAW UNDER THE SIXTH
AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION
BECAUSE THE TRIAL COURT JUDGE WAS BIASE OR CORRUPT, OR BOTH,
BECAUSE:(1) the judge had a conflict of interest with appointed
DEFENSE COUNSEL: AND(2) THE JUDGE HAD A CONFLICT OF INTEREST
WITH THE PROSECUTION AND DALLAS DISTRICT ATTORNEYS OFFICE

Petitioner alleges that the trial court judge, Janice Warder,
was biased or corrupt, or both, based on the following facts:
(1) Judge Warder had a conflict of interest with trial counsel,
Paul Johnson, in that she over compensated him monitarily for the
an unjust reason, or relationship, or in order that he could
provide a kick-back or other form of remuneration from his increase
court paid legal fees; and
(2) judge Warder had a conflict of interest with the prosecution
from the Dallas District Attorneys office; in that she tried to
both conceal and participate in their long established practice
of racial discrimination by removing an African-American from the
jury panel in a scheme to violate the BATSON STANDARD.

## STANDARDS
## A. The Fair and Impartial Jury Standard
The Sixth Amendment's guarentee of trial by jury extends to all
state criminal cases which would require a jury if tried in a
federal court. U.S.CONST.Amend.VI; Duncan v. Louisiana,88 S.Ct.1444
(1968). The Fourteenth Amendment's Due Process Clause requires
the impartiality of any jury empaneled to try a cause. U.S.CONST.
AMend.XIV; Irvin v Dowd,81 S.C¥=1639 (1961). The Supreme Court
analyzed this right in Morgan v Illinois,112 S.CT.2222(1992)(In
essence, the right to jury trial guarantees to the criminally
accused a fair trial by a panel of impartial, indifferent jurors.
The failure to accord an accused a fair hearing violates even the
minimal standards of due process. A fair trial in a fair tribunal
is a basic requirement of due process)

## B. Judicial Bias and Corruption Standards
Usually, a judge's qualifications are not considered to be a
constitutional issue. However, the DUE PROCESS CLAUSE requires a
"fair trial in a fair tribunal" before a judge with no actual bias
against the defendant and "a judge will violate a defendant's due
process rights if he is biased against the defendant or has an
interest in the outcome of the case." See Bracy v Gramley,117S.Ct.
1793(1997)(finding a due process violation where the judge imposed
excessively harsh treatment on petitioner in order to hide or to
compensate for the fact that he was taking bribes to give light
sentences in other cases).

The Supreme Court has stated "Criminal defendant tried by a
partial judge is entitled to have his conviction set aside, no
matter how strong the evidence against him." See Edwards v Balishoh,
117 s.Ct.1584 (1997). And that "A likelihood of appearance of bias

can disqualify a judge as well." See Taylor v Hages,94 S.Ct.2697 (1979).

Generally, the Supreme Court has recognized two kinds of judicial bias: actual bias and presumptive bias. See Withrow v Larkin,95 S.Ct.1456 (1975). And that it was necessary to "examine the record for indications of actual bias on the part of the trial judge." See Bigby v Dretke,402 F3d 551 (5thCir.2005), for bias relating to pecuniary or procedural infirmities.

Generally,"only the most egregious misconduct, such as bribery of a judge, or member of the jury, or the fabrication of evidence by... on the court."See Rozier v Ford Moter Corp.,573 F2d 1332 (5thCir. 1978)Bribery requires a specific intent to give or receive something of value in exchange for an official act per 18 USCA §201 and in Workman v Bell,484 F3d 337 (6thCir.2007) which states, Elements of fraud on the court are:
(1) conduct on the part of officers of court;
(2) that is directed at judicial machinery itself;
(3) that is intentionally false, willfully blind to truth, or is reckless disregard for truth;
(4) that is positive averment or concealment when one is under duty to disclose; and
(5) that deceives court.

The Supreme Court has made it clear that there is a presumption of legitimacy to public officer's actions, and clear evidence to the contrary must be presented in order to contradict that presumption. see National Archives & Records Admin. v Favish,124 S.Ct. 1570(2004). And while trial court does not always have an affirmative duty to inquire into the possibility that defense counsel has a conflict of interest, it does have a duty to conduct a GARCIA hearing once it has been alerted and certinaly when it knows of existence of an actual conflict of interest. See U.S.v Greig, 967 F2d 1018(5thCir.1992). Which the petitioner has repeatedly done through his written NOTICES to both the state trial court and CCA, as well as to this U.S. District Court (USDC) per, Chapman v U.S.,469 F2d 634(5thCir.1972)(We agree with the district court that there is duty imposed on defendants to notify the courts of an inadequacy in the assistance of counsel...), and that the reason petitioner has been put into this current particular situation of having to submit his own, pro se Supplemental Writ of habeas corpus, without legal assistance or lawyer, is because  no attorney will visit with petitioner or discuss his claims of bias and corruption of the judge and conflict of interests of judge and appointed trial and appeal counsels in the case at bar.

Per Fed.R.Civ.P.,Rule 9. Pleading Special Matters,(b) Fraud or Mistakes; Conditions of mind. In alleging fraud or mistakes a party must state with particularity the circumstance constituting fraud or mistake. Malice, intention, knowledge, and other condition of a person's mind may be alleged generally.

**FACTS SUPPORTING GROUNDS FOR CLAIM**
Petitioner would show the following facts and circumstances which
took place during his voir dire and trial, which individually or
in the cumulative will prove or provide clear evidence of the bias
or corruption of the trial judge, Janice Warder, first by her
conflict of interest with trial counsel, Paul Johnson, as follows:

During the unusually long voir dire proceeding, the petitioner kept
notes as to the dates, times, and veniremembers called; and which
ones were passed by agreement, challenged, striked or seated on
the jury each day. The first day of voir dire was Monday, January
25, 2002 and the last day of voir dire was Friday, April 5, 2002,
when the last juror was slected and then the alternate juror. As
of this writing petitioner has not received the requested complete
trial record and is therefor unable to prepare a comparative
analysis per the Supreme Court's decision in Miller-El v Dretke
(Miller-El II), 125 S.Ct.2317(2005).

A total of 10 calendar weeks elapsed between the start and end of
the voir dire. Two days were taken off for the holiday on February
8th and 11th, and one day taken off for Good Friday, March 29th.
In addition the three days of March 4th, 5th and 6th were taken
off to allow Mr.Johnson to go on a fishing trip to Mexico.

There were a total of 44 days on which voir dire proceedings were
conducted. And there were a total of 167 veniremembers scheduled
and examined for empaneling for the jury, plus 6 additional for
the one alternate, for a total of 173 veniremembers examined over
44 days, or 3.9 veniremembers examined per day.

This unusually long time period and large number of veniremembers
on the surface might not seem unusual, but in the context of a
court appointed public defender for an indigent defendant accused
of capital murder in Texas and with appointed counsel,Mr.Johnson,
repeatedly stating to petitioner that,"he was not appointed to
defend the petitioner, but only to make sure the i's were dotted
and the t's crossed on the petitioner's death sentence," it does
appear highly unusual. Also note Justice's Thomas' comment in his
dissenting in Miller-El II(What is more, voir dire at Miller-El's
trial lasted five weeks...)

Petitioner will also point out that he was involuntarily medicated
with an anti-pyschotic drug and was unable to effectively parti-
cipate or object or complain of the misconduct of the trial counsel
and judge (see other claims). For whom would the petitioner then
complain to ? The trial counsel, Mr.Johnson, had already demonstr-
ated his ability to have the jail guards threaten the petitioner
with violence and refuse him food; which was extremely important
to petitioner under the influence  of the anti-pyschotic and which
caused the petitioner to drop from 195 lbs to 167 lbs upon his
arrival at death-row on May 1, 2002 because Mr Johnson had ordered
jail personnel to only feed the petitioner two bologna sandwiches
and water each day from Jan.25,2002 through April 30, 2002, from
between 4AM to about 7PM each day in effect denying petitioner the

jail's main meal each day and causing the petitioner to irrationally fear that he was going to die from stravation. (Note Mark Stroman, another death-row inmate was in the next holding cell and court to petitioner and he was brought his main jail meal each day at the court.) Mr Johnson also used the promise of giving the petitioner something to eat if he would go on the record in the court and repeat what Mr Johnson instructed him to say, and each time the the petitioner did as he was told, Mr Johnson never delivered on his promise of getting some food for the petitioner. These acts were tantamount to physical and pyschological torture by the appointed trial counsel and judge and were a violation of the petitioner's rights under the 14th Amendment's Due Process Clause as quoted in Riggins v Nevade,112 S.Ct.1810(1992)(Riggins' core contention that involuntary administration of Mellarial denied him "full and fair trial." Pet.for Cert. Our discussion in Washington v Harper,110 S. Ct.1028(1990), provides useful background for evaluating this claim. In Harper, a prison inmate alleged...State and various individuals violated his right to due process by giving him Mellarial and other antipsychotic drugs against his will...we agreed that his interest in avoiding involuntary administration of antipsychotic drugs was protected under 14th Amendment's Due Process Clause.)

JUDGE'S CONFLICT OF INTEREST WITH DEFENSE COUNSEL
Prior to arrest, petitioner was a licensed professional Certified Public Accountant (CPA) for almost 20 years and was qualified as an expert witness in a federal court per Fed.R.Evid/ on the subject of financial and government contracting fraud, and began questioning defense counsel,Mr Paul Brauchle, about some of the activities he observed in the courtroom during the long and drawn out voir dire.

i) Petitioner asked Mr Brauchle, why the trial court judge's hours were so short each day, usually from about 10AM to 4PM with an hour or more break for lunch each day? Mr Brauchle's reply was that the judge only needed to allow a certain minimum number of hours each day in the courtroom to allow Mr Johnson to submit and collect his full days fee at his full daily billing rate. Since petitioner was held in the court's holding cells for about nine hours each day he also learned from the bailiffs that the judge kept very short work hours, coming in late every day and leaving early every day. On September 25, 2006 the Dallas Morning News (DMN) on page 12A, ran an election recommendation for a former prosecutor and against the sitting judge, JAnice Warder, citing the following:

Democrat Robert Burns has built a convincing case for making a a change in this court. mr. Burns...raised question about Judge Janice Warder's management. Judge Warder's court has been among the most expensive in recent years, both in total cost and net cost per diposition...But her cost-benefit is a concern, and she has been unpersuasive on this subject.

prior to this article the petitioner had written the DMN about his observations of Judge Warder and Mr Johnson, and Mr Johnson's comments to petitioner about his having a personal relationship with Judge Warder when they were  both employed as prosecutors in

the Dallas District Attorneys office. Petitioner did not know if this claim by Mr Johnson was true or just bravado, but it became obvious in the courtroom that they did have some type of special or conflicted relationship between themselves.

ii) Petitioner asked Mr Brauchle, why was the court coordinator bring to Mr johnson at the defense table each day, criminal case files, and why was Mr Johnson taking the files and leaving the courtroom each time the prosecution began the examination of a new veniremember by reciting the prepared "WALK" (which was a half hour to 45 minute blow-by-blow description of how the State would exe-cute the petitioner), then Mr Johnson would return to the courtroom about the same time the prosecution would pass the witness, and what where the forms Mr Johnson was busy filling out when he returned to the courtroom ? Mr Brauchle's reply was that  the judge was giving Mr Johnson the new cases each day so that the judge could compensate Mr Johnson an additional $1,000 per day. Mr Brauchle explained the Mr Johnson was not qualified as a First Chair Death penalty counsel, therefore his per day rate was only half of Mr Brauchle's approved First Chair rate. That Judge Warder wanted to compensate Mr johnson at the higher rate and, therefore, was giving him the 3 to 4 additional cases to make an announcement on and claim the initial legal fees from the cases.

iii) On the first day of trial, petitioner commented on the fact that Mr Johnson must have gotten paid and he stated he had and that he had also taken a class on Texas Death Penalty and was now a First Chair capital murder defense counsel. Petitioner congrad-ulated Mr Johnson on his accomplishment and also on his brand new suit, shirt, and tie, but noted the lawyer was still wearing his old worn out black cowboy boots which he wore every day with all manner of dress. Mr Johnson acknowledged the complement by showing the petitioner his new Monte Blanc pen. Petitioner asked if it was a fountain pen and Mr Johnson showed that it was not, which allowed petitioner to see that Mr Johnson had on a brand new Rolex wrist-watch, which petitioner also complemented Mr Johnson on aquiring.

A few minutes later after being seated at the defense table with leg shackels and surrounded by four armed sheriff deputys, the petitioner watched Judge Warder going about her usual routine on the bench and also noticed she was admiring and looking at a new wristwatch which she was wearing and which appeared to be similar to the then popular woman's version of the Cartier Tank Watch, which petitioner had not previously noticed the judge wearing. Petitioner noted these items because in his 20 years experience as a CPA in Dallas and seven years as a federal manager and bank liquidator for both the FDIC and RTC, that these symbols of pretend wealth were also ubiquitous in Dallas since the 1980's boom and bust cycles as signs of four-flushers, con-artists, money-launderers, bribe-takers and high-end prostitutes for which these objects were a ready form of currency.

Petitioner had once observed two managers from Coopers & Lybrand give to an RTC manager a Rolex watch after closing a Saving & Loan. And the next day visiting the manager in his RTC office explaining

how his wife had just given him a new Rolex for a present. This became a bit of a common occurrence at the RTC; That $30,000 to $40,000 per year administrative and accounting staff were sporting $20,000 wristwatches, while still wearing polyester clothing and driving $15,000 cars. Though the E-1's and about made out much better. And the point being that the observation of two parties engaged in a arms-length and opposite ends of a government contract process; such as the approval and payment of an awarded contractor's submitted billing statements, simultaneously displaying one of these conspicuous and expensive objects is usually a red-flag of some type of impropriety or conflict of interest as opposed to a mere serendipitous coincidence. And though a cold trial record cannot reflect this type of "behind the scenes" display and transaction, a discovery and analysis of court financial and payment records with this context in mind may reveal the ~~the~~ underlying impropriety for which the transaction was initially entered into for.

**FACTS SUPPORTING GROUNDS FOR CLAIM**
Secondly, petitioner would show that the following facts and circumstances took place during the voir dire proceeding which by itself or cumulatively with the other incidents related in this claim will prove or provide clear evidence of the bias or corrupt actions of the trial judge, Janice Warder, by her conflict of interest with the prosecutors from the Dallas District Attorneys (D.A.) office as follows:
During the voir dire the two prosecutors and defense counsel, Mr Johnson, explicitly agreed off the record and while in the courtroom on the morning of February 7, 2002, to exclude the African-American (Black) veniremember, Ms. Latoneau Alexander, juror #503, from the jury panel. They stated they did not want the record to reflect the prosecution making a "Batson Violation" by "Striking" the Black veniremember. So it was agreed among them that the prosecution would accept the Black veniremember and that in turn defense counsel, Mr Johnson, would challenge the Black veniremember for cause, ~~then when unsuccessful~~, and when unsuccessful he would use a peremptory strike #5 to remove the Black veniremember. Therefore, causing her not to be seated on the jury for racially discrimatory reasons in violation of the Equal Protection Clause of the 14th Amendment and the Batson STANDARD. See U.S.v Vasquez-Lopez, 22 F3d 900(9thCir.1994)(The constitution forbids all parties in either criminal or civil trials from challenging prospective jurors soley on account of their race. Georgia v McMollum,112 S.Ct. 2348(1992).) The trial judge was implicit in this agreement by permitting the scheme between the prosecutors and defense counsel to be carried out and the Black veniremember being dismissed without any Batson Challenge or inquiry as to the racial or race-neutral reason for the dismissal. See Reed v Quarterman,555 F3d 364 (5thCIr.2009)(The Constitution forbids striking even a single prospective juror for a discriminatory purpose.)

**C. BATSON STANDARD**
Batson provides a three-step process for a trial court to use in adjudicating a claim that a peremptory challenge was based on race. See Snyder v louisiana,128 S.Ct.1203(2008)([7] In Miller-El v Dretke,

the Court made it clear that in considering a Batson objection, or in reviewing a ruling claiming to be Batson error, all of the circumstances that bear upon the issue of racial animosity must be consulted.125 S.Ct2317.),(In other circumstances, we have held that, once it is shown that a disrciminatory intent was a substantial or motivating factor in an action taken by a state actor, the burden shifts to the party defending the action to show that this factor was not determinative. See Hunter v Underwood,105 S.Ct.1916(1985).)

JUDGE'S CONFLICT OF INTEREST WITH DALLAS PROSECUTORS
Their actions affected a "back-door" way around the Batson requirements for an examination as to the race neutral reasons for the prosecution or the defense removing for cause or striking a racial minority veniremember from a jury selection process. The trial judge was complacent in this "back-door" Equal Protection Clause violation with the prosecutors and defense counsel, since she had openly discussed with them earlier in the day and off the record their disgust with the recent newspaper reports on the Miller-El case from Dallas working its way up to the U.S.Supreme Court on the issue of racial discrimination practices by the prosecutors from the Dallas D.A.'s office at the time of the 1986 Miller-El trial in Dallas. See  Miller-El subra.(Racial discrimination by State jury offends Equal protection Clause of 14th Amend.),(make a prima facie case of discrimination...on totality of facts) and (for more than a century, the Court consistently and repeatedly has affirmed that racial discrimination by State in jury selection offends the Equal Protection Clause.)

The petitioner had also read the newspaper accounts of the Miller-El case going up on appeals and basically understood the Batson issue discussed in the context of the case. When petitioner overheard the two prosecutors, Mr Johnson, and Judge Warder discussing their distaste for the BATSON STANDARD, the Miller-El case, the U.S. Supreme Court, and the allegations of systemic and institutional racism in the Dallas D.A.'s office; they all appeared to confirm the newspaper accounts of the racism practiced and indoctrinated into the legal staff at the Dallas D.A.'s office. See Batson v Kentucky,106 S.Ct.1712(1986)(An instruction book used by the prosecutor's office in Dallas County,Texas, explicitly advisd prosecutors that they conduct jury selection so as to eliminate "'any member of a minority of a minority group'"[3]), ([3]Van Dyke, at 152, qouting Texas Observer,May 11,1973...An earlier jury-selection treaties circulated in the same county instructed prosecutors:"Do not take Jews, Negroes, Dagos, Mexicans or a member of any minority race on a jury, no matter how rich or how well educated." Quoted in DMN, Mar.9,1986)

Since petitioner had in 1999, during the beginning of his civil divorce proceedings, been labelled a "JEW" and "NIGGER" by his wife, Ms.Pearle, and via her by his neighbors,Mr John and Marcelen Wilson, and through them the inner circle of the Highland Park And Hunt Family clans, these lowly lawyers form the D.A.'s office barely looked upon the petitioner as more than an inanimate object sitting in the courtroom, especially given the amount of drugs they all knew he was forced to swallow each morning on his way to the courthouse. And being a DAGO, it was assumed he could not comprehend and speak English, much less read.(1st wife called me her Nigger-baby-setter.)

When the prosecutors and Mr Johnson openly discussed how they would inact this action, or scheme, or fraud on the court, it was in part accomplished because the trial judge had ordered the court-room sealed, and no persons were allowed in the court's public seating area during the entire duration of the voir dire. The only persons who were ever seated in the public section of the court-room were court personnel, Ms Cynthia Dyer and Mr Bill Hill of the D.A.'s office, two or three SMU Law School students who asked and were granted permission by Judge Warder to watch on one day, and a single individual who the petitioner had noted was seated behind him and in the front of the courtroom almost every single day of the voir dire. She was a 60-ish white female, who had white short curly hair and, oddly enough, wore the exact same fuzzy hot-pink sweater and pair of tight fitting black leather pants each and every day in the courtroom. After petitioner was certain the woman was not a hallucination, he asked defense counsel, Mr Johnson, who the woman was? Mr Johnson replied that she was a friend of Judge Warder and was named Irene Pence and was going to write a book about the petitioner's case and trial. See "No Daddy! Don't!", by Irene Pence, Pinnacle Books, Kensington Publishing Corp.,850 Third Ave.,New York,NY 10022,ISBN 0-7860-1554-3.

Petitioner's friends had also asked to be allowed to come to the courtroom and watch the voir dire proceeding, but were told by court staff that the judge had instructed that no one from the public was allowed into the courtroom either while the petitioner was present or during the proceeding. This was a violation of the petitioner's right to a public trial per the 6th and 14th Amendments.

JUDGE'S DEMONSTRATED PARTIALITY AND CONFLICT OF INTEREST
Also during the voir dire the petitioner noticed a system of signals being used by the court reporter, Ms Belton, the prosecutor, Mr Robinson, the defense counsel, Mr Johnson, and the trial judge, Janice Warder. When petitioner realized that the trial judge was also attempting to signal the veniremembers while on the witness stand while answering questions, he felt he should somehow try and document the actions. Since petitioner had been warned by trial counsel and bailiffs that if he moved or tried to speak out in the courtroom he would be forced to sit out the proceedings in a holding cell and be wired up with an electronic shock-belt while in the courtroom, neither of which petitioner was told he would like. So when petitioner noted that defense counsel, Mr Brauchle, did not seem to participate (though he did appear to be asleep at times) in the use of these signals or be aware of them, petitioner decided to alert Mr Brauchle and see what action he would take regarding the signalling. After petitioner explained the system and Mr Brauchle watched both the trial judge and prosecutors signalling the wit-ness by having the witness follow the movements of their heads as to how to answer, Mr Brauchle stood up and "objected to the judge and prosecution bobble-heading the witness." Then it appeared the practice of using signalling had stopped. Petitioner does not know if the "bobble-heading objection" was for real and reflected in the court record or that Mr Brauchle just signalled to the trial judge

that the petitioner was catching on to how she was actually select-
ing or "rigging the jury." Petitioner has been requesting a copy
of this objection in the voir dire record for over nines years and
no appointed attorney, either state or federal, would answer the
petitioner's question of whether this "objection" was in fact refle-
cted on the record or not; in either the affirmative or negative,
and still to this day have not heard a word.

Petitioner wrote state Direct Appeal counsel,Mr Parks, to this
issue of the raise "objection" at trial, but he refused to place
as a claim in petitioner's Direct Appeal, No.74-348. And Mr Parks
wrote petitioner that the signals were "non-verbal", and therefor,
not reflected on the record and therefor could not be brought up
in the appeal. Petitioner has noted other events and items not
reflected on the parts of the record he has just been able to see.

Petitioner also wrote the state habeas counsel, Ms Hemphill, about
the issue to be raise in the state writ, but she just refused to
reply to any writing the petitioner sent her regarding his trial
and appeals, until she resigned from this case and abandoned the
petitioner on the federal district court's doorstep after the CCA
denied relief on writ, WR 71-939-01 (September 23,2009). See
Lewis v Dretke,355 F3d 364 or No. 02-11007(5thCir.2003) regarding
Ms Hemphill's handling of death-penalty trial and attorney files.

Both Parks and Hemphill are former qualified death penalty defense
counsels in Dallas, as well as Ms Hemphill being the former sitting
judge in Court no.1, until loosing her re-election bid to the former
prosecutor from the Dallas D.A.'s,Janice Warder. Also see recent
DMN articles regarding prosecutor and judge Warder mis-handling,
convicting innocent defendants, and being biased in a death-penalty
case. Petitioner believes there is a strong likelihood that these
appointed state appeal counsels were well aware of these illegal
practices inside this courtroom during this death penalty voir dire
proceding and that they were not only prejudiced and biased, but
also particapants, and therefore violators of the petitioner's
constitutional rights to a public trial, a fair trial, an unbiased
judge and an unbiased jury in violation of the 6th and 14th Amend.
This is either incompetence or evidence or a demonstration of an
ongoing and actual conflict of interest between the trial judge,
Janice Warder, and the appointed trial and appeal counsels and the
Dallas District Attorneys office.

On August 29,2005 petitioner submitted to trial court his, PRO SE
ANSWER TO STATE'S ORIGINAL ANSWER TO APPLICATION FOR WRIT OF HABEAS
CORPUS, and on page four objected to the State's claim that no
objection had been raised regarding the voir dire proceeding and
petitioner never received acknowledgement of filing the PRO SE
ANSWER form either the court or the habeas counsel, Ms Hemphill.
On page four the petitioner also outlined the signalling scheme
in the courtroom explained above. Petitioner also mailed a copy
to his former neighbor, attorney John Wilson, with a handwritten
note explaining to Mr Wilson how petitioner's former wife, Ms Pearl,
had intentionally conned the Wilsons in order for her to gain access

into the Highland Park and Hunt Family inner circles by turning
against the petitioner and labelling him an "under-cover Jew" and
oddly not concerned about her duaghter's  status as "pure-white"
within those circles, and how the closeted Dallas D.A.,Bill Hill,
and his assistant D.A.'s had assisted Ms Pearle in defrauding and
breaking a sworn pledg before God, the petitoner of his entire
community property estate. Within weeks petitioner's former home
in Highland Park was listed for sale for $2million and soon after
the Dallas D.A.,Bill Hill, made a surprise announcement that he
would not run for re-election for a third term as Dallas D.A., thus
opening the door for the election of the first Black D.A. in Texas.

The federal counsel, Ms Schmucker, stated she would address no issue
not previously raised on state appeal, therefore, again, leaving the
petitioner no choice but to try and present these claims in this
pro se supplemental writ because no appointed counsel is willing
to address them or the conduct of these lawyers and judges. They
only want to get paid and showing how things really work will not
keep you very much work.As Mr Johnson pointed out to me once, that
if he ever won a death-penalty case that would be the last one he
would ever get appointed to. The Court should put him on the stand
and under oath, which his buddy little judge Robert Burns would not
do at the petitioner's state habeas. Mr johnson's a big talker and
petitioner would like to hear him swear to God or on his son's soul.

**D. STANDARD FOR JUDGE'S EX PARTE COMMUNICATION WITH PROSECUTION**
Petitioner cannot find an exact case to match this type a bias and
corruption by a trial judge in a Texas death penalty case, but read
an article in the TEXAS LAWYER, for August 6, 2007,page 7, titled
"Judicial Impartiality at issue in appeal of capital murder case
4th Court of Appeals." Abdyqapparova v State, San Antonio Court of
Appeals, Appeal No.04-05-00321-CR, 7-25-2007, which states:
   Trial Judge- engaging in written [or any] communication with the
   State regarding potential jurors, defense counsel's voir dire
   questions and presentation of arguments all in the presense of
   the potential jurors, was improper...asserted the trial court
   improperly engaged in ex parte communications with prosecutor
   in violation of her due process rights...Because the right vio-
   lated in the case was the right to a impartial judge, which is
   structural error, the court did not conduct a harm analysis.

The above is from petitioner's handwritten notes taken from the
article written by Mary Alice Robbins and was published by American
Legal Media, 1423 Main Street, Dallas, Texas 75202. Petitioner has
been unable to obtain the actual case from TDCJ law library. But
petitioner believes the above allegations presented in this claim
substantially match those in the above TEXAS LAWYER article and
is clear evidence of the trial judge's official misconduct and
partiality at the petitioner's trial and is a structural error
which defies harmless error analysis and was a violation of the
petitioner's rights under the 6th and 14th Amendments.

## HARM ANALYSIS FOR SUPPLEMENTAL CLAIM # 9

**Petitioner** has shown that he was actually harmed by the denial
of his 6th and 14th Amendment right to a fair trial, due process
of law and an impartial judge when the trial court erred by fail-
ing to stop and examine for a race nuetral reason under BATSON
STANDARD the challenge and striking of the Black veniremember, Ms
Latoneau Alexander, juror #503, from the jury panel. She was a
perfectly acceptable juror and, therefore, was a constitutional
and structural error as opposed to a "trial error" as defined by
the CHAPMAN methodology for categorizing constitutional errors.

If structural or hybrid errors occurs in state court, harmless
error review is inappropriate on petition  for federal habeas
relief. See Burgess v Dretke, 350 F3d 461 (5thCir.2003)("Structural
Error" precluding harmless error review on petition for federal
habeas relief, is error that infects entire trial process, such as
biased trial judge or denial of counsel to defendant.)

It is the petitioner's position that the  striking of the Black
juror for racial discriminatory purposes in a scheme by both the
prosecutors and the defense counsel, and allowed to go un-checked
and challenged by the trial judge, was or resulted in a denial of
due process and is a constitutional violation and structural error
which rendered the petitioner's trial unfair and per se prejudicial.
See Arizona v  Fulminante, 111 S.Ct.1246 (1991)(stating
"structural defect[s] affect [] the framework within which the
trial proceeds, rather than [are] simply...error[s] in the trial
process').

Petitioner has shown facts of impartial judge at trial similar to
Edwards v Balisok, 117 S.Ct.1584 (1997)(when the trial judge is not
impartial); Bell v Cone, 122 S.Ct.1843 (2002)(when petitioner is
denied counsel at a "critical stage" of the proceedings), and
Roe v Floes-Ortega, 120 S.Ct.1029 (2000)(when the petitioner is
effectively denied the right to an appeal). See also Neder v U.S.
. 119 S.Ct.1827 (1999)

## REQUESTED RELIEF

The error is an error of constitutional magnitude under both
the Sixth and Fourteenth Amendments that involves the framework
of the trial and defies harmless error analysis. Accordingly, the
constitution requires that the conviction be reversed and the
case be remanded to the trial court or the petitioner set free.

## CLAIM #10

**THE FORCIBLE ADMINISTRATION OF AN ANTIPSYCHOTIC MEDICATION DURING THE COURSE OF VOIR DIRE AND TRIAL VIOLATED PETITIONER'S RIGHTS TO A FAIR TRIAL AS GUARENTEED BY THE DUE PROCESS CLAUSE OF THE SIXTH AND FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION**

Petitioner would show that the following facts and circumstances took place during his voir dire and trial, which by itself or in the cumulative with the other claims will prove or provide clear evidence of the bias or corrupt actions of the trial judge, Janice Warder, in her ordering that the jail personnel have the petitioner forcibly medicated each day before leaving the jail for the court with an antipsychotic drug during the course of the voir dire and trial, against petitioner's consent, in order to render him incapacitated and unable of assisting with his own trial defense, and more importantly, to render him unable to effectively complain or object, or both, about the conflicted and biased conduct of the appointed trial counsel, Mr Johnson, and the trial judge Warder, so that they could carry out their schemes of official misconduct and fraud on the court as related in **CLAIM #9** and **CLAIM #11**, all in violation of the Due Process Clause of the 6th and 14th Amend.

**STANDARD**
In Riggins v Nevada,112 S.Ct.1810(1992),the U.S. Supreme Court turned to Riggins' core contention that involuntary administration of Mellaril denied him "full and fair trial." Pet.for Cert. "Our discussion in Washington v Harper,110 S.Ct.1028(1990),provides useful background for evaluating this claim. In Harper, a prison inmate alleges...state and various individuals violated his right to due process by giving him Mellaril and other antipsychotic drugs against his will...we agreed that his interest in avoiding involuntary administration of antipsychotic drugs was protected under the Fourteenth Amendment Due Process Clause and "The forcible injection of medication into a nonconsenting person's body." we said "represents a substantial interference with that person's liberty." Id. 110 S.CT.at 1041. in the case of antipsychotics like Mellari, that interference is particularly severe:

> The purpose of the drugs is to alter the chemical balance in a patient's brain, leading to changes, intended to be beneficial, in his or her cognitive processes. While the therapeutic bene-fits of antipsychotic drugs are well documented, it is also

true that the drugs can have serious, even fatal, side effects. See Riggins v Nevada,subra (finding that the forced administration of an antipsychotic drug to defendant may have impermissibly violated his constitutional rights to receive a fair trial by compromising the substance of his testimony, interaction with counsel,  and comprehension). See Sell v U.S.,123 S.Ct.2174 (2003) (In order to find that involuntary medication of a mentally ill defendant will significantly further important state interests, as required when considering whether involuntary to administer anti-psychotic drugs to render a mentally ill defendant competent to stand trial, a court must find that administration of the drugs is substanially likely to render the defendant competent to stand

trial, a court must find that adminisrtation of the drugs is sub-
stantially likely to render the defendant competent to stand trial,
and that adminisration of the drugs is substantially unlikely to
have side effects that will interfere significantly with the def-
endant's ability to assist counsel in conducting a trial defense,
thereby render the trial unfair.)

**FACTS SUPPORTING GROUNDS FOR CLAIM**
Upon petitioner's arrival at the Texas death-row on May 1, 2002,
he was denied any of the medications he had been forced to take
each day prior to trial. TDCJ psychological staff said there were
no records of petitioner receiving any medications. Petitioner
explained what had been stated at trial about petitioner by the
expert witness pyschiatrists and TDCJ psych-staff had petitioner
take the same exact tests he had taken in the jail prior to trial
and was told by TDCJ psychologist that there was nothing wrong
with the petitioner to require any psych-medicines and that some-
times the trial attorneys just order the defendants drugged to
make them manageable in the courtroom and to make them look stupid
and unsympathetic to the jury. Petitioner has related this CLAIM
to all his appointed appeal counsels and has requested that they
obtain or subpoena the TDCJ psych-evaluation and tests of petitioner
in 2002, but none has replied. As of May 2011, petitioner has never
needed to see the psych-staff for any complaint or needed any
psych-medications, once he had made it through a year long with-
drawal period from the drugs.

**EXPERT WITNESS ORDER ANTIPSYCHOTIC WITHOUT GOOD MEDICAL NECESSITY**
Petitioner's appointed counsel retained expert witnesses, Dr.
Crowder and Dr. Stonedale, both psychiatrists who ordered an anti-
psychotic drug, Zyprexa, for the petitioner prior to the start of
the court proceedings because Dr.Stonedale testified:
A. In our first examination of Mr Battaglia he was not being
   treated for his illness. And was so manic we had to terminate
   our interview, because he was literally bouncing off the walls.
   We could not keep him still, could not get any straight answers.
   (RR.Vol.53pg7-11)

A. Yes. We-myself and Dr Crowder and on at least one occassion we
   had a psychiatric resident with us. We interviewed Mr Battaglia
   on 9-7-01 for almost two hours. That interview had to be term-
   inated. And then on 12--I can't read my own writing here, 12-2-01,
   that was for about three hours. 11-13 that was almost three
   hours. A total of about eight hours worth of interviews.(V.53p88)

The first above statement by Dr Stonedale was not only prejudicial
but was in fact false. Petitioner was escorted and watched by jail
guards during each of these meetings and tests and would have
never been allowed to "bounce off the walls" without being physical
restrained by the guards. Second Dr Stonedale's statement about
petitioner not being treated for his illness is also false, because
the subpoenaed jail pharmacy card for pettioner shows he was being
medicated with 20mg Celexa since 08/21/01, an anti-depressant drug,
which shows him being medicated on the day of the first interview

on 9-7-01 and the only cause for petitioner's in-ability to give
"any straight answers" was due possibly to his recent administrat-
ion of the anti-depressant, which petitioner had never taken before
or the fact that the psychiatrists refused to answer his questions.

**PETITIONER'S REQUEST FOR INVESTIGATION OF RELEVANT FACTS REFUSED**
Petitioner had never taken anti-depressant or anti-pyschotic drugs
before, but recognized the effects on him as similar to those he
had experienced the week prior to his arrest in May of 2001, where
he became so ill he had to see a doctor and was given a blood test
because the doctor had stated he had some unusual results, and was
put on an anti-biotic for some type of infection, but not the flu,
which is what he thought he had come down with.

Petitioner had related the above to defense counsel, Mr Johnson,
previously, and to the two expert witness psychiatrists, who he
also requested they help him obtain:
· blood test and doctor's report from April 25,2001,PRIMACARE
· drug test report from probation officer GIBBS from April 30, 2001
· a current blood analysis of petitioner
· petitioner's psychological records from Dr.Irv Gadle's treatment
· medical attention for injuries from arrest, jail refused to treat

All of which these two medical doctors and expert witnesses refused,
and showed an initial bias towards the petitioner which caused him
to question them regarding their backgrounds and types of clinical
or analytical training, such as Freudian or Jungian, to which they
also both refused to reply. Under some more questioning, Dr. Crowder
acknowledged that he went to Southwestern Medical School and with
a Dr Andy Campbell. Petitioner pointed out that Dr Campbell was a
former lover and free-base-cocaine and heroin i.v. drug user with
Ms Pearle and her brother,Ricky, when she was barely 18 years old
and that Ms Pearle had refered to Dr Campbell's medical specialty
as consisting of drugging and sexually assaulting his clients.
And that if Ms Pearle had secretly drugged the petitioner, Dr.
Campbell would have been her most likely source of the drugs,since
he was then providing her with psych-drugs she wasn't being given
by her regular doctor, which disclosed during our divorce.

Therefore, petitioner requested Dr Crowder disqualify himself for
possible conflict of interest to which he and Mr Johnson refused
as well as refused to investigate or subpoena the requested and
relevant medical and psychological records of the petitioner for
the basis for a plea of "Not guilty by reason of insanity cause by
the unknown intoxicant or poison secretly administered without
knowledge." And attorney work files shows every subpoena for
medical records except for the above requested ones.

Petitioner believes and would show the Court that the involuntary
medication with the anti-psychotic was done to keep petitioner
form raising a valid and plausible defense, which would require to
implicate Ms Pearle or another party as having had a hand in the
cause of the deaths of her two daughters, and would also require
exposing her criminal activities, her relationships and bribery of

public officials, and her threats to have the petitioner and his children killed for his first going to local law enforcement and then to the INTERNAL REVENUE SERVICES-CRIMINAL INVESTIGATION DIVISION (IRS-CID) with evidence of Ms Pearle and State District Judge, John M. Marshall's, illegal money laundering activities to defraud petitioner, and also the judge's corruption in influencing both the Dallas D.A.'s office assist Ms Pearle in defrauding petitioner of his entire community property estate under Texas Law and  enlisting the help of Judge David Finn and Judge Theo Bedard to assist in carrying out the fraud through the use of their courts. And is why the first question Mr Johnson asked the petitioner at their first meeting in the jail when he stated he had been appointed as legal counsel was;"could he have authorized access to my CPA office and client files," made absolutely no sence.

**COUNSEL & EXPERTS KNEW ANTIPSYCHOTIC WOULD INTERFERE WITH THINKING**
Dr. Stonedale testified (RR.Vol.53pg111,line19 and 16):
A. So we had to terminate the interview, Try to get the jail psychiatrist to medicate him for bipolar illness.

A. Yes, we convinced the jail psychiatrist to put him on Zyprexa [anti-psychotic], a mood stabilizer...we got them to come up to 10 milligrams, and they were unwilling to come any higher.

Q. [Johnson]...during the course of time that we had asked you to perform this evaluation, did there come a time when we had to take John off of his medication for purposes of allowing Dr. Lovett to do some psychological testing when he was not under the influence of any medication.

A. Yes, we took him off everything and he got extremely manic. He was - I think he was extremely incomfortable. He became so ill at that time.

The above testimony by Dr Stonedale and counsel, Johnson, show their awareness that the anti-psychotic drug, Zyprexa, was not medically necessary and would interfere with petitioner's mental and thought processes enough to require him to stop taking the drugs in order to take an I.Q. test, an MMPI, an Ink-Blot test, and others given by Dr. Lovett. Which, again were the same tests TDCJ gave petitioner some six months later, but after a longer period of being off the medications. Stopping these type of drugs also made the petitioner extremely ill, but that is a commonly known side effect of these powerfull mind altering drugs, and is the reason for the high rate of suicides caused when the drugs are abruptly stopped. Petitioner's daughter, Christie, was put on these drugs by her mother,Ms Ghetti, when she was 14 years old and also had a suicide attempt when the drugs were stopped, per Ms Ghetti's call to petitioner in April 2001.

A Dr. Patrick Carney, in 1985, had diagnosed petitioner as having a rare drug allergy to certain types of combinations of psychological drugs and anti-biotic drugs (synthetics), which he had termed an allergic drug erruption because the reaction was that the petitioner's skin would blisser and burn in his thigh and groin region from the

drug combination. And is the reason petitioner would never take these type drugs, which also both his ex-wives knew as well. The medical organization that treated petitioner in 1985 treated him in April 2001; EmCare and PrimaCare, of which the first, petitioner's father had been an executive to owner Dr. Lenard Riggs of Dallas. And the fact that both expert witnesses and defense counsel would not subpoena these medical records for the evaluation or the defense of the petitioner points to some reason which goes above and beyond the violations in WIGGINS STANDARD. See Wiggens v Smith, 123 S.Ct.2527(2003)(granting defendant's claim for ineffective assistance of counsel when counsel failed to investigate defendant's life history, which included sexual and physical abuse, deminished mental capacities, and severe family problems). And is more similar to the violation of the petitioner's rights as refered to in the earlier STANDARD, see Sell v U.S.,subra.

Again, was the reason for medicating the petitioner to keep him silent about his own knowledge of what took place leading up to May 2, 2001, to conceal the culpability of Ms Pearle and to conceal the criminal conspiracy involving Ms Pearle, Judge Marshall, her retained lawyers Mr Ed Davis and Larry Hanse, and the assistant D.A.'s? The petitioner and Mr Steve Lowder in April 2001 had watched these assistant D.A.'s on a police under-cover surveillance vidio, which Mr Lowder said he obtained by paying a few detectives from University Park Police Department to wire-tap, follow and vidio record his wife, Malisa Lowder, after she had file for divorce and was trying to blackmail him into turning over an interest in a pre-marital trust with approx. $10million in cash and real estate) meet with Ms Pearle, Ms Lowder, the assistant D.A. who forced the petitioner into an illegal plea agreement in Judge Finn's Court and which was used to give the petitioner the death-penalty at trial, and a third woman, who may be the D.A.'s child abuse supervisor, arrange a "shake-down" and "divorce fraud" on Mr Lowder as they had previously done to the petitioner in August 2000 to sign over his interest in $4 million in community property real estate. And why defense counsel, Mr Johnson, refused to subpoena this vidio of this criminal conspiracy which also showed the D.A. and Ms. Pearle and Ms Lowder using cocaine before leaving the Oaklawn restaurant, Parise, and heading to the Greenville Ave. ecstacy bar, the Red Jacket, for a night on the town, and her driving home to Ms Lowder's house with the police vidioing up till the lights went out in their bedroom. Petitioner had related everyone of these incidents and facts to both Mr johnson and Expert witnesses and they still refused to investigate, document in their notes, obtain or subpoena, or cross-examine the State's Witnesses about these incidents leading up till May 2, 2001, which if nothing else would go to petitioner's state of mind.

**WHO ORDERED THE JAIL TO FORCIBLY MEDICATE PETITIONER ?**
Petitioner has been unable to determine if an actual ORDER exists
regarding his forced medication with Zyprexa during voir dire and
trial. But, petitioner can factually state that he was marched each
morning under guard and prior to being placed in the jail holding
cells, to the jail's old west tower pharmacy, where petitioner was
required to take the psych drugs each morning. Petitioner was not
allowed to keep any drugs on his person as almost all the other
single housed inmates were allowed. Also the petitioner was required
to open his mouth after taking each drug to show the guards that he
had swallowed the drug, which petitioner noticed was not required
of any other inmate, and at times the guards would use their hands
to force open the petitioner's mouth to check if he was trying to
hide the drugs. Petitioner had asked a number of the guards, why
was he being forced to take the drugs and in the manner he was,
which required so much attention from the guards each morning, and
they always stated it was a "STANDING ORDER" in the jail by the
judge, that petitioner was not allowed into the courthouse without
being medicated first thing each day.

Petitioner reviewd Mr Johnson's workpaper file and found the sub-
poena of the jail records on petitioner, but noted the following
items missing:
·logbooks guards kept on petitioner's activities every 15 minutes
·tape-recordings of legal visits with attorneys; Ms Tiernan, Ms
Garcai, and Mr Johnson (which petitioner realized were being made
after Ms Garcia admonished him for talking to Dallas D.A. about what
we had discussed in a prior legal visit, which cost her a job with
the D.A.'s office, but which petitioner only related to Johnso; and
Johnson's habit of showing up to legal visits with no writing pad
to take notes on (which petitioner has noticed is a compulsive
habit of almost every lawyer he has known); and examination of
Johnson's notes shows they are transcriptions of items from another
source onto a legal pad because certian items we discussed are
reflected and other items such as Ms Pearle's criminal activities
or bribery of D.A.'s and judges, or Judge Marshall's involvement
, or his marrying us, are all missing from the produced lawyer
workpapers, again, indicating their transcription of certian items
from legal visits from recordings or a transcript provided by the
D.A.'s office and provided to Johnson and used to produce his hand
written notes - all in violation of client-attorney privilege;
one can see that they are quite different from his trial notes,
which petitioner did observe Johnson making in the courtroom, but
those are more of a nervous habit with him.)
·copies of all the mail Mr Johnson instructed petitioner to send
 to his dad to type up and mail back to Mr Johnson because he claimed
he had no secretary, but told petitioner at end of trial that the
jail had copied all the mail and given it to the D.A.'s office.

The attorney workpapers also have in Mr Johnson's handwriting a
notation from Dr. Pittman, the jail psychiatrist who saw the
petitioner once a week, stating that petitioner,"wants to come
off meds for trial." But there are no other comments or annotations
in the produced workpaper files regarding orders or drugs.

**EXPERT TESTIMONY A FRAUD ON COURT AND ATTEMPT TO CONCEAL MITIGATION**
Petitioner would show by presenting an alternative theory that the
expert witness doctors were attempting to induce in the petitioner
some type of false psychotic or psychological state in his mind,
much the same as has recently been reported about the practice of
implanting false memories of childhood abuse or sexual abuse by
unethical psychologists to generate client fees, because of the
petitioner's and Mr Johnson's recent interactions and animosity
over the defense plea and refusals to obtain evidence or witnesses.

Since his arrest in May 2001, petitioner had claimed that he was
unknowingly and illegally drugged or poisoned by  either his ex-wife,
Ms Pearle, or another party he was unaware of. Though Ms Pearle
testified at trial of an ongoing and contentious relationship with
the petitioner, the opposite was quite the norm in the weeks leading
up to May 2, 2001. Ms Pearle had intentionally instigated the
alleged threatening phone call in early April 2001 by calling the
petitioner and telling him on the morning of his court ordered
anger management class that he had to return his daughter, christie,
immediately to the DFW Airport to fly home because one of her class
mates had died the day before when Christie flew into Dallas. Ms
Pearle made this call instead of Christie's mother, Ms Ghetti, to
start some type of argument with petitioner as she always did and
called from a phone which petitioner could not call back on there-
fore requiring him to return the call on his daughter's phone and
answering machine since they were in school and asking Ms Pearle
to take Christie to DFW for the petitioner since she was having so
much fun sticking her noise in to my and Christie's spring break
and first visit with each other in a year and a half because of her
previous interference with my visitation with my daughter. Ms Pearle
had previously called the Family Place and the Dallas Probation
Offices to try and get the petitioner into trouble and have his
probation revoked, but petitioner was used to these continuous acts
by Ms Pearle, just as he was used to nine years of her threats to
have the petitioner killed or murdered if he did not do as she ask
and petitoner really didn't mind that much because he liked Ms Pearle
and knew she was a nut-case, but who else would marry the petitioner,
but a nut-case, such as Ms Ghetti. Petitioner never wanted to be
married in his whole life and took two incredible con-arts to force
him into it. He hated Ms Ghetti, but really liked Ms Pearle. So when
she was going about her normal harrassing activities the petitioner
took it in stride and had no idea she was planning on having him
arrest until May 2,2001. Up till then Ms Pearle was always provid-
ing the petitioner a large plate of food for him to take home for
diner at each visitation and on the saturday prior to May 2, 2001
she had brought him a bag from Whataburger for lunch at his new
loft apartment with a bag for each of her daughters. But later
testified to police and at trial that she had never been to the
petitioner's new apartment before, though she had the building
manager let her in that Saturay who took her and Liberty up to
meet the petitioner and Faith who were busy setting up the girl's
new room and other things that they usually used at his house. So
if she had wanted to, she could have easily drugged petitioner.
For he was the target for her inferiority complex since her dad's
death and her slide back into drug abuse and perverted sex.

Petitioner had stated to Johnson and the doctors that the only exp-
lanination for the alleged actions of petitioner; was his being
in a drug induced psychotic state brought about by some unknown
chemical agent without the petitioner's consent or knowledge which
may have also caused an allergic reaction with the anti-biotic the
petitioner was taking at the time and therefore leaving the only
possible and acceptable defense, a plea of not guilty by reason of
insanity as induced by an unknown agent or chemical. Mr Johnson
did not want to pursue this defense, but petitioner insisted and
was standing up in the courtroom on the first day of trial and was
stating that defense when Mr Johnson stood up and spoke over the
petitioner and stated just, "Not Guilty." Petitioner was initially
confused and upon reviewing that part of the trial record provided
by federal habeas counsel, saw that the exchange was  not recorded
in the record as it took place, as were a number of other comments
made by Mr Johnson. Such as an opening remark to the jury where he
stated the petitioner was "guilty as hell!" and another where he
admonished the petitioner in front of the jury,"to show some damn
emotions" referring to the photos, and petitioner replied"I can't
because of the drugs", which are not currently on the record, but
petitioner's other outburst,"that he loved his his daughters" at
the taunting by the prosecutor, was reflected on the record.

Petitioner has stated to both Johnson and experts that his ex-wife,
Ms Pearle, had threatened to have petitioner falsely imprisoned or
murdered if he ever tried to leave her (a lesbian characteristic I
am assuming), which he did after she filed a false divorce claiming
family violence. Which Ms Pearle admitted to petitioner was only
done by her retained lawyers to try and force petitioner to file
the five years of back false federal income tax returns jointly
with Ms Pearle which he had refused to do until she disclosed where
her millions of dollars in cash were coming from. Petitioner really
didn't care about the money and tax returns and had already pre-
pared them, but wanted his wife to stop lying all the time about
her sexual affairs with her heroin using younger boyfriend,J.B.,
and her cocain using lesbian girlfriends Karen, Malissa, and a few
scary looking little dikes that she was bring home with her and
to stop continuely threatening to kill or murder the petitioner
for not doing as she wanted. Petitioner also related and provided
the police murder report of Mark Shawn Hutchins in Ms Pearle's
drug-house in August of 1982 for as she stated "hitting her once."
Judge Warder and Mr Johnson refused to cross-examine her about the
threat and murder while she was on the stand, but they all knew
that inside to 18 page report written by Officer Gunn, the boy
had been on his knees in the backyard grass, vomited, and then
was shot in the back and the back of his head, then dragged away
until the police showed up before they could drive away with the
body because a neighbor had heard the shots and called the police.
Petitioner showed the report to Mr Brad Lollar one day in the
courthouse and Brad said, "Yeh! The kid was executed",and that he
thought he remembered the case until I told him my wife said she
did it, then he shut-up. The murder report and all other evidence
of Ms pearle's criminal activities have been removed from the work
paper files of Mr johnson and are unavailable anywhere else now.

In fact three full months after Ms Pearle had filed the false div-
orce claims and gotten a protective order against petitioner, Aug.
2,1999 he finally packed up all his personal things and moved out
of his Highland Park home and Ms Pearle immediately had the locks
changed and started calling the HP police, beginning the more than
100 false police reports to which nothing was ever done other than
HP Police Chief Phant personally telling petitioner that his kind
wasn't allowed in Highland Park and Ms Pearle getting the undivided
special attention of the sole lesbian police detective on the force.
SGT Katherine Justice, who became Ms Pearle's surrogate male prot-
ector. As did the lesbian probation officer Gidds, who testified to.

Also related were the false charges set-up by Ms Pearle and pet's
retained counsel, Mr Jim B. Martin (now judge, go figure!), in a
scheme to force petitioner to sign over his half of his $2million
fully paid for home in H.P. Mr Martin had admitted to setting up
the Christams day visit in 1999 against petitioner's instructions
and when petitioner was about to plead "no contest" because Martin
had advised him to even though he never touched Ms Pearle as she
swore out (especially as she described, petitioner in fairly large
and hit Ms Ghetti twice one time and he knocked her into the next
state, so Ms Pearle's statements were totally false) in Judge Finn's
court in early 2000. Petitioner was waiting outside the courtroom
while Mr Martin was supposed to be working out the details on the
misdmeanor assult charge when a new attorney friend of his saw the
petitioner and asked what he was doing there. He briefly explained
what was taking place and she advised he sit tight for a minute and
she would see what was up by talking to her law school buddy who
was the chief prosecutor in Finn's court. She came back a few minutes
later and told petitioner to fire Mr Martin and not agree to any-
thing because her friend D.A. Bryan [Flood is what I have determined
his last name to be] had told her confidentially that he and Ms
Pearle and Mr Martin were setting-up some Highland Park guy with
a false assault charge so they could use his kids or the threat of
prison later to get him to sign over his half of his H.P. home.

Petitioner also related the incident behind his 1988 assault plea
on punching Ms Laborde-Ghetti twice in the head after she threatened
to kill her daughter, Christie, as revenge for petitioner ratting
her out to Akin, Gump named partner Mr Allen Feld about her fraud
bankruptcy she hid in the Ft. Worth federal court under my last
name. Another Akin, Gump attorney had refered petitioner to Mr Brad
Lollar,(who in turn refered Mr Jim Martin (the circle closes)) to
assist with the prior false charges made by attorney Labrde-Ghetti
during their divorce. But the lawyers and the then D.A.Bobby Francis
had strung the petitioner along for almost two years on the assault
charge refusing him a trial or even to see a courtroom while Ghetti
hid his daughter, Christie, in Louisiana, in violation of court order.
Finally petitioner had ex-wife served out of state for comtempt and
the attorneys wanted petitioner to plead the assualt charge, but Mr
Lollar insisted that to get the felony dropped to a misdemenor the
petitioner would have to allow Mr Lollar to preform homosexual sex
on petitioner or he and D.A. Francis would keep him from seeing kid.
Petitioner complied and signed the plea in Lollar's home at night.

In the context of the homosexual assualt by the attorney Brad Lollar
 and the forced plea agreement with D.A. Bobby Francis, petitioner
related to counsel and experts his being sexually assaulted basicly
as happened with Lollar, when he was a 12 year old by a family
aquantence he was made to go paint houses with as a summer job
when he lived in Oregon. Mr Johnson's actions confirm his conflict
of interest with the protection of the criminal sexual assault and
official oppression of his fellow former D.A.'s and death-penalty
counsels than he was for any interest in defending the petitioner.

Petitioner also related his almost year long treatment by Dr.Irv
Gadle, who the petitioner related to Dr Lovett who confirmed that
he knew Dr Gadle as well, but Mr Johnson and experts refused to
subpoena Dr Gadel's records as they had done of all the others
petitioner had disclosed he had seen. This may have been done by
Mr Johnson because he knew the records would reflect joint meetings
with attorney Laborde-Ghetti (which were also 100% paid for by her
law firm Akin, Gump) where she disclosed three abortions before
she was 18 years of age, her scheming pregnancies, her bi-sexual,
lesbian and multiple partner sexual encounters with strangers,
fellow lawyers, bosses, possibly her incestous relationship with
her father as a child. All of which petitioner had also related
about his second wife Ms Pearle, who had admitted to an incestous
conception and petitioner had agreed to be the father for her. All
of which Mr Johnson and experts kept as quiet as church-mice about.

Not a word of any of the above which was related to Mr Johnson and
expert witnesses is relfected in attoney workpaper files or on the
record at trial. Even if the petitioner were delussional in these
claims, the lawyer and experts would have noted the above as such
and presented it att trial instead of allowing the state's witness-
es to fabricate testimoneys from their previously submitted false
declarations, which both witnesses,Ms Laborde-Ghetti and Ms Pearle,
didn't start making until the day the petitioner walk out the door
of each of the houses he was living with them in. Not one word prior
from Ms Laborde as long as petitioner stayed with her and not a
word for the nine years the petitioner stayed with Ms Pearle.

**DISCOVERY**

If this Court would require the production of the April 2001 police vidio tape petitioner watched at Mr Steve Lowder's home showing the meeting of his wife, Ms Lowder, Ms Pearle, the third female, who petitioner believes may be another Dallas D.A., but memory has faded over time to remember her exact face and her name who, Mr Lowder had mentioned, because he had only wanted the petitioner to indentify the male D.A. from Judge Finn's court who brought the false assault charge in 2000. Then the Court might see that the petitioner is actually innocent of the charge of capital murder, because he possessed no actual intent or knowledge of the crime or mens rea because of his being drugged by Ms Pearle for either revenge or for having seen the above vidio, which Mr Johnson, again, refused to subpoena because of his conflict of interst with the Dallas D.A.'s office or the trial judge and other sitting judges at that time, who included Judge Marshall and Judge Robert Francis. And which could have been introduced at trial as evidence of motive, impeachment, cross-examination or even mitigation but was not for the reason that it reached right into the heart of the Dallas D.A.'s office and through their illegal and corrupt activities which brought about the deaths of two little angels named FAITH & LIBERTY, because the only thing that can do such a thing, is absolute corruption of the law. The Dallas D.A.'s office had no interest in letting this fact be known or of exposing Ms Pearle's or Ms Lowder's roles in this criminal action because they could only expose the Dallas D.A.'s office as their partners in crime. When petitioner alerted his old neighor, attorney Wilson, to Ms Pearle's true character, he must have had a talk with D.A. Bill Hill.

This would mean involving a "miscarriage of justice" exception to any procedural default that the court and State may attempt to raise in opposition to petitioner's claims. Petitioner must raise the "miscarriage of justice" exception because the "failure to consider the claims [that are procedurally defaulted] will result in a fundamental miscarriage of justice." The Supreme Court has not clearly said what a fundamental miscarriage of justice is, but, in Schlup v Delo,115 S.Ct.851 (1995), the Court hinted strongly that this expection require a persuasive showing of actual innocence, and claiming why the court should consider petitioner's claims if court attempts to procedurally default or bar his unexhausted claims presented therein.

Petitioner would also request this Court try and secure or obtain the evidence of the criminal activities of both the Dallas D.A.'s office and Ms Pearle and Ms Lower (which petitioner turned over to the IRS-CID in 2000) and Mr Johnson's conflict of interest by the subpoenaing of the privilege-violating recorded legal meetings.

The state courts appear less interested in pursueing this issue or claim because of potential conflicts or loyalties. See Bracy v Gramley, subra, (finding that it is the duty of the courts to provide the necessary facilities and procedures for an adequate inquiry if petitioner's allegations when fully developed may demonstrate that the petitioner is entitled to relief.)

## HARM ANALYSIS For SUPPLEMENTAL CLAIM #10

Petitioner has shown how he was actually harmed by the deniAL of
his Sixth and Fourteenth Amendment rights to a fair trial, Due
Process of Law, and impartial judge at trial, and that these
violations of petitioner's Constitutional rights had substantially
affected the outcome of his trial.

But in this case the Court should make an exception to the harmless
error rule because the petitioner was harmed by the nature and
magnitude of the violations in denying petitioner his right to a
fair trial which involves the structural framework of the trial
itself. These violations are called "per se prejudicial" (and
sometimes called strudural errors) and are not subject to the
harmless error rule. Per se prejudicial violations include the
total deprivation of the right to counsel which the petitioner
has attempted to demonstrate took place at his trial, the denial
of the right to an impartial judge which petitioner has attempted
to demostrate through her conflict of interest with defense
counsel, her conflict of interest with the prosecution at trial,
and by her involutarily and forcible medication of the petitioner
with a mind altering anti-psychotic drug in order to deny the
petitioner his liberty of mind and thoughts to effect his defense
at trial, and by the effective denial the right to an appeal which
the petitioner is demonstrating by the fact of having to prepare
this pro se supplemental application for writ of habeas corpus in
this instant case.

And since the nature of some of these errors will not be reflected
in the trial record for evaluation, reversal is required because
the State will be unable to prove even harmless error. See
Holloway v Arkansas, 98 S.Ct.1173 (1978)

## REQUESTED RELIEF

The above errors are errors of a constitutional magnitude under
the Sixth and Fourteenth Amendments that involve the framework of
the trial and defy harmless error analysis. Accordingly, the
constitution requires that the conviction be reverse and the case
be remanded to the trial court or the petitioner set free.

## CLAIM # 11
**TRIAL COUNSEL FAILED TO PROVIDE EFFECTIVE ASSISTANCE OF COUNSEL AT BOTH PHASES OF PETITIONER'TRIAL DUE TO AN ACTUAL CONFLICT OF INTEREST WHICH THE TRIAL COURT FAILED TO INQUIRE INTO FOR WHICH IT KNEW OR REASONABLY SHOULD HAVE KNOWN IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION**

Petitioner alleges that trial counsel, Paul Johnson, waas ineffective in his representation of the petitioner during both the guilt/innocence phase and the punishment phase of his trial because counsel labored under an actual and demonstrated conflict interest as previously laid out for the Court in the context of the prior CLAIM #9 and CLAIM#10 within this pleading. And that the trial court's failure to inquire into the potential conflict of interest about which it knew or reasonably should have known, as petitioner has also demonstrated by relating the actions and conflicts of the trial judge, Janice Warder, was a violation of the Sixth and Fourteenth Amendments.

## STANDARDS FOR INEFFECTIVE ASSISTANCE OF COUNCEL
Effective assistance of counsel is a right guarenteed by the Sixth and through the Fourteenth Amendment. The federal test for effect-ive assistance of counsel is Strickland v Washington,104 S.Ct.2052 (1984), is also the test in Texas. Under this test, one must show that counsel's performance was deficient and that the deficient performance prejudiced the defense. Prejudice means there is a reasonable probability that but for counsel's acts or ommissions, the outcome of the proceeding would have been different, and a reasonable probability is a probability sufficent to undermine confidence in the outcome.Id. An ineffective assistance of councel claim is a mixed question of law and fact subject to pleary review under the Strictland test.

Petitioner alleges ineffective assistance of councel in this claim and his prior claims that are of such a nature and magnitude that they meet the exception to the STRICKLAND general rule and presume a probable effect upon the outcome where assistance of counsel has been denied entirely or during a critical stage of the proceeding. The Supreme Court has held in several cases that "circumstances of that magnitude," U.S. v Cronic,104 S.Ct2039, may also arise when defendant's attorney actively represents conflicting interests. See also Holloway v Arkansas,98 S.Ct.1173, Cuyler v Sullivan,100 S.Ct.1708, and Wood v Georgia,101 S.Ct.1097.

In  Mickens v Taylor,122 S.Ct.1237(2002), the Supreme Court states that "there is an exception to the general rule. We have spared the defendant the need of showing probable effect upon the outcome, and have simply presumed such effect, where assistance of counsel has been denied or during a critical stage of the proceeding, when that has occurred, the likehood that the verdict is unreliable is so high that a case-by-case inquiry is unnecessary. See Cronic... But, only in circumstances of that magnitude."

**FACTS' SUPPORTING GROUNDS FOR CLAIM**
Petitioner would show the following facts and circumstances which
took place during his voir dire and trial, which individually or
in the cumulative will prove or provide clear evidence of trial
counsel, Paul Johnson's, ineffective assistance of counsel due to
an actual conflict of interest,which the petitioner has partially
laid out in his CLAIM #9 and CLAIM #10 regarding the conflict of
interests with the trial judge and the prosecutors from the Dallas
D.A.'s office, and in this CLAIM due to counsel's actual and
demonstrated conflict of interest with the State's witnesses at trial
and their criminal conspiracy with members of the Dallas D.A.'s
office and members of the Dallas Judicial Bar.

This Court should also consider this claim of ineffevtive assistance
of counsel based on a conflict of interest, to expand and explain
the claims of ineffective assistance of counsel raised in the
original application filed on September 22, 2010, for they will
provide the Court with a solid foundation for which to look at the
claim (Issue) why did Mr Johnson not present the power-point
presentation prepared for mitigation (Issue FIVE (3); because at
the last minute he noted the presentation had a reference to Ms
Pearle being paid for bearing her two children per the petitioner
which he had not seen and did not want presented at trial (he may
have worried that his Rolex would be recalled?) and made the
petitioner stand up and state he understood why, but that was only
due to claim (Issue FIVE (4) failing to use Battaglia's father as
a mitigation witness, because the expert witnesses and trial counsel,
Mr Johnson, had previously informed the petitioner that the D.A.'s
office had interviewed petitioner's brother, marc, who had told
them that petitioner's father had actually had the petitioner's mom
killed instead of the official suicide reported and Mr Johnson

used this leverage or threat of putting the petitioner's father
on the witness stand and letting the prosecution bring the
allegation up in public against the petitioner's father which the
petitioner could not allow, because though he may have agreed in
some sence with his favorite younger brother, he has had to always
explain to him that loyalty to your family was like loyalty to GOD,
in that you could never breach either. my little brother has past
away now, but at the time of this interview he was dying of a long
illness and was very angery with petitioner's father,and Ms Pearle
took that as an opportunity to try and drive a wedge through my
family at the particular moment,and Mr johnson's ability to also
capitalize on that piece of information is a testiment to his utter
duplicity. In (Issue THREE) original claim,it states that the
last seated juror, mr Brewer, was objectionable and should have been
removed for cause but had to be seated because the defense was out
of strikes, but if you had been there each day you know that he
was scheduled for earlier in the week and he was knowingly set for
the last day and the last seat on the jury with no strikes left
based on his Questionair, which at one point the judge refused to
let the petitioner read in the court or in the holding cell inside
the courtroom for the pretext that the petitioner would stalk the
jurors or some other type of harrassment, like that was possible.

TRIAL·COUNCEL'S CONFLICT OF INTEREST WITH DALLAS JUDICIAL BAR
Review of Mr johnson's notes mention the petitioner relating his
contact with the two Fort Worth, IRS-CID Agents Ms Bonnie Stone
and Linda Sivley in 1999 and 2000, but have no reference to the
related threats form Ms Pearle to have the petitioner killed, this
making the contact with the IRS-CID Agents (which discovered by
wire-tapping the petitioner's hard-line CPA office phone because
he only spoke to the Agents via his cellphone, but on their first
trip to his CPA office they got lost and called on his land-line
and within 10 minutes of their arrival in the CPA office Ms Pearle
burst into the office to look at them, but Mr Johnson most likely
did not want to see them at trial and therefore refused to call
them). This is a crime of tampering with and threatening a protected
government witness or relator, as petitioner was in the context of
his civil False Claims Act (FCA) he had brought the previous year
in federal court; he was still protected under the federal whistle-
blower laws, but Mr Johnson and the D.A.'s office hid and concealed
this impeachment evidence in violation of the BRADY RULE. The BRADY
materials would not only prove the protected contacts and threats,
but also the documentary evidence of the underlying criminal act-
ivities reported to the IRS-CID Agents; of Ms Pearle and senior state
district judge ,John M. Marshall's, money-laundering activities.
With the actual bank statements of Ms Pearle showing in her own
handwriting the name and SSN of Judge Marshall and his mother,
Elinore Marshall, Gifting tens of thousands of dollar to ms Pearle
over a number of years and the accompanying gift letter with the
$440,000 mortage application, which were all fabricated to money-
launder the $400,000 down-payment on a Highland Park home because
Ms Pearle could not deposit that large amount of cash to a bank
or explain where she had obtained it from either, therefore, the
money-laundering with the Judge and some others also reported to
the IRS-CID Agents.

Petitioner also noted the Agents names and phone numbers in the
attoney's workpapers taken from the petitioner's DayTimer, but Mr
Johnson refused to contact or subpoena them as he had lead the
petitioner believe when he stated he would call his friends Mr
James Young, who had set up the meeting with the IRS-CID Agents
and Ms Vida Hughes, who had witnesses Ms Pearle barge into the CPA office
where the IRS-CID Agents were meeting regarding Ms Pearle and others.
When these two witnesses were on the witness-stand at trial Mr
Johson basically pulled a bait-and-switch and asked the two about
other topics which he did not discuss with the petitioner before
trial. These violations by Mr Johnson are similar to the rights
to present mitigation evidence per WIGGINS v Smith,123 S.Ct.2527
(2007), but in Johnson's case the failure to present evidence was
motivated by his conflict of interest to conceal a judge's crimes.

See also Ex Parte Michael Roy Toney, No.AP-76056 & No.WR-51,047-3
(2008 WL 5245307 & 5245324)(Dec.17,2008) for a similar Texas death
penalty case of a BRADY RULE violation by the Tarrent County D.A.'s.
In which they concealed an hid exculpitory and impeachment evidence
about the State's main witnesses attempts to have the defendant
killer or murdered, but was not disclosed at trial for credibility.

## HARM ANALYSIS FOR SUPPLEMENTAL CLAIM #11

Petitioner has shown that he was actually harmed by the denial of his 6th and 14th Amendment right to counsel when trial counsel, paul Johnson, had no adversarial relationship with the State, but in fact was acting as the State's surrogate, which effectively left petitioner without counsel during the entire trial proceeding. Such an error is "per se prejudicial" per Arizonia v Fulminate,111 S.Ct. 1246(1991)( The second class of constitutional error we called "structural defects." These "defy analysis by 'harmless-error' standards" because they "affect the framework within which the trial proceed." and are not "simply an error in the trial process itself:...Such errors include the denial of counsel, see Gideon v Wainwright,83 S.Ct.792(1963))

## REQUESTED RELIEF

The above errors are errors of a constitutional magnitude under the Sixth and Fourteenth Amendments that involve the framework of the trial and defy harmless error analysis. Accordingly, the constitution requires that the conviction be reversed and the case be remanded to the trial court or the petitioner set free.

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, John David Battaglia, petitioner, prays that this Court: 1) Stay and Abate these proceedings to allow petitioner to seek relief as to these Supplemental Claims #9, #10, and #11 in State court and then allow petitioner a reasonable time in which to Amend this petition;

(1) Vacate the petitioner's conviction and death sentence;
(2) Order and conduct an evidentiary hearing at which proof may be offered as to the allegations in this petition;
(3) Provide for discovery as requested in this petition;
(4) Grant a certificate of appealability for any claim denied relief;
(5) Grant any relief as law and justice may require.

I, John David Battaglia, the petitioner, declare under the penalty of perjury that each and every allegation of fact contained in the foregoing pro se supplemental application for writ of habeas corpus is true and correct, signed this 12th day of May, 2011.

John David Battaglia
999412
3872 FM 350 South
Livingston, TX 77351

### CERTIFICATE OF FILING

Per Rules Governing Section 2254 Cases in the U.S. District Courts, Rule 3, Filing the Petition; Inmate Filing; petitioner, John David Battaglia, declares under the penalty of perjury, that I have timely deposited in the TDCJ internal mailing system at 5AM, Friday, May 13, 2011, a prepaid First Class Postage envelope marked **LEGAL MAIL** and containing this original signed pro se supplemental application for writ of habeas corpus and one judge's carbon copy, to be **LOGGED** in as **LEGAL MAIL** and then placed in the U.S. Postal Service for delivery to the Clerk of the U.S. District Court, Dallas Division.

John David Battaglia
999412
3872 FM 350 South
Livingston, TX 77351

### CERTIFICATION OF SERVICE

I do hereby certify that a true and correct carbon copy of the above and foregoing pro se supplemental application for writ of habeas corpus has been placed in the TDCJ internal mailing system at 5AM, May 13, 2011, to be **LOGGED** in as **LEGAL MAIL** and placed in the U.S. Postal Service for delivery to Mr. W. Erich Dryden, Assistant Attorney General, for the Respondent at following address:

Attorney General of Texas
Post-Conviction Division
W. Erich Dryden
P.O. Box 12548
Austin, TX 78711-2548

John David Battaglia
999412
3872 FM 350 South
Livingston, TX 77351

JOHN DAVID BATTAGLIA
999412
3872 FM 350 South
Livingston, TX 77351

May 12, 2011                                                        LEGAL MAIL

U.S. District Court
Northern District of Texas-Dallas Division
1100 Commer
Dallas, TX 75242

**RE; CASE 3:09-cv-1904-B; JOHN DAVID BATTAGLIA v. THALER, TDCJ**
**(CAPITAL CASE)**

Dear Clerk of the U.S. District Court:

   Would you please file with the Court the enclosed original and
one judge's carbon copy of my pro se supplemental application for
writ of habea corpus, persuant to 28 U.S.C. §2254.


   I have also enclosed the first page of a carbon copy of the
pro se writ to be stamped FILED & DATED by the Court clerk and
returned to me in the enclosed stamped and self-addressed envelope.


   I thank the court clerk for their assistance in filing the
original pro se writ pleading and judge's copy and for returning
the stamped copy to me.

                                    Sincerely,

                         John David Battaglia




cc:W. Erich Dryden, Assistant A.G.
cc:file



JOHN D. BATTAGLIA - 999412
Polunsky Unit
3872 Fm 350 South
Livingston, TX 77351

LEGAL MAIL

RECEIVED
MAY 27 2011

U.S. District Court
Northern District Texas
Dallas Division
1100 Commerce Street
Dallas, TX 75242

USA FIRST-CLASS FOREVER